# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ASVRF PATERSON PLANK RD J-C, LLC,

        Plaintiff/Counterclaim-
        Defendant,

        v.

BRASS WORKS URBAN RENEWAL
COMPANY, LLC,

        Defendant/Counterclaim-
        Plaintiff,

        and,

ROBERT M. GREER, ROBERT F. GREER,
SANFORD WEISS, and CITY HOMES
AND GARDENS, LLC,

        Defendants,

        and,

PATERSON PLANK RD J-C, LLC,

        Nominal Defendant /
        Nominal Counterclaim-
        Defendant.

C.A. No. 2025-0549-LWW

## MEMORANDUM OPINION

Date Submitted: September 12, 2025
Date Decided: November 21, 2025

Rebecca L. Butcher, Jennifer L. Cree, Howard W. Robertson IV, LANDIS RATH
& COBB LLP, Wilmington, Delaware; Kirk L. Brett, Patrick T. O'Connor,

ADLER & STACHENFELD LLP, New York, New York; *Attorneys for Plaintiff and Counterclaim Defendant ASVRF Paterson Plank RD J-C, LLC*

Brian M. Rostocki, Nicholas R. Rodriguez, Evan D. Sweeney, REED SMITH LLP, Wilmington, Delaware; Timothy J. Muyano, REED SMITH LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant and Counterclaim Plaintiff Brass Works Urban Renewal Company, LLC*

**WILL, Vice Chancellor**

This expedited post-trial opinion resolves a struggle for control over a limited liability company that indirectly owns a New Jersey residential complex. The defendant real estate sponsor defaulted on its payment obligations to the plaintiff preferred equity investor, triggering a contractual removal remedy. When the defendant failed to cure its default, the plaintiff exercised its right to remove the defendant as the company's manager.

Rather than step aside, the defendant dug in. It ignored the removal notice, denied the new property manager access to the site, and purported to "redeem" the plaintiff's interest without the authority to do so. This suit followed.

The plaintiff asks that I confirm it is the company's rightful manager. The defendant asks me to look past the plain text of the parties' agreement to avoid what it deems an equitable forfeiture. But Delaware courts enforce contracts as written. The defendant defaulted, the plaintiff followed the contractual roadmap to replace the defendant as manager, and the defendant breached its obligation to facilitate that transition. Judgment is for the plaintiff.

1

# I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

## A. The Cliffs

This case raises a control dispute over Paterson Plank RD J-C, LLC. At its heart, the dispute concerns the ownership and management of The Cliffs Lofts, a 120-unit residential building in Jersey City, New Jersey.[2]

The Cliffs is the crown jewel of the Greer family, who has developed, financed, and managed over 1,000 residential units in northern New Jersey.[3] In 2002, Robert (Bobby) M. Greer with his sons Robert (Rob) F. Greer and Jonathan Greer, purchased the property—then a "grimy" abandoned warehouse.[4] After six years of "sweat equity," Bobby and Rob Greer developed it into a luxury residential property.[5]

---

[1] *See* Joint Pre-trial Stipulation and Order (Dkt. 70) ("PTO"). The trial record includes 187 joint exhibits, five deposition transcripts, and live testimony of two fact witnesses. Trial testimony is cited as "[Name] Tr. __." *See* Trial Tr. (Dkt. 87). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* Joint Tr. Ex. List (Dkt. 71).

[2] *See* Aff. of Eric J. Cannon (Dkt. 72) ("Cannon Aff.") ¶ 4. Eric Cannon submitted an affidavit in lieu of live direct trial testimony.

[3] Aff. of Robert F. Greer (Dkt. 69) ("Greer Aff.") ¶ 8. Rob Greer submitted an affidavit in lieu of live direct trial testimony.

[4] Greer Aff. ¶¶ 9-11.

[5] *Id.* ¶ 11.

The Greers initially hoped to sell high-end condominiums in the Cliffs.[6] Because the project was completed amid the 2008 financial crisis, they launched the Cliffs as a rental building.[7] Another Greer-family-owned company, City Homes and Gardens, LLC, began leasing and managing the property.[8]

## B. The LLC Agreement

Sometime in late 2020 or early 2021, Bobby Greer approached American Realty Advisors ("ARA"), a private equity real estate investment management firm, about providing capital to the Cliffs.[9] ARA sent him a term sheet listing the principal terms under which it would invest.[10] The term sheet contemplated that ARA and Greer affiliates would be the sole members of a newly formed entity.[11]

On June 29, 2021, ARA affiliate ASVRF Paterson Plank RD J-C, LLC and Greer affiliate Brass Works Urban Renewal Company, LLC executed the Limited Liability Company Agreement ("LLC Agreement") of Paterson Plank RD J-C, LLC

---

[6] *Id.* ¶ 9.

[7] *Id.* ¶ 12.

[8] *Id.* ¶ 13; *see* JX 6 (Property Management Agreement).

[9] Greer Aff. ¶ 14.

[10] *Id.* ¶ 15; *see* JX 2 (term sheet); *see also* American Realty Advisors, https://www.aracapital.com (last visited Nov. 18, 2025).

[11] JX 2 at 1.

(the "Company").[12]  The Company's purpose is to acquire, operate, manage, and improve the Cliffs.[13]  ASVRF contributed $18 million to the Company in exchange for 100% of its Class B preferred equity.[14]  Brass Works contributed the Cliffs' real property, became the 100% owner of the Company's Class A membership interests, and was appointed the initial "Manager."[15]

In the LLC Agreement, Brass Works agreed to cause the Company to pay ASVRF a monthly preferred distribution.[16]  Brass Works also became obligated to make capital contributions to fund any preferred return shortfall.[17]  If the Company failed to pay an amount owed to ASVRF within ten days of its due date, an "Event of Default" would occur.[18]

---

[12] PTO ¶¶ 6, 8; JX 7 ("LLC Agreement").  The Company, a Delaware limited liability company, is the sole member of the entity that owns the property.  PTO ¶ 6; *see* JX 3 (organizational chart).  Brass Works is a New Jersey limited liability company indirectly owned by Bobby Greer, Rob Greer, Jonathan Greer, and Sanford Weiss.  PTO ¶ 5; *see* JX 3.  ASVRF is a Delaware limited liability company indirectly owned by ARA.  PTO ¶ 4; *see* JX 3.

[13] LLC Agreement § 2.6.

[14] *Id.* at 1; *id.* at Ex. A.

[15] *Id.* at 1; *id.* at art. I (defining "Manager"); PTO ¶ 12 (stating that, as the Manager, Brass Works was "charged with managing the affairs of the Company").

[16] LLC Agreement §§ 3.2, 5.1.  ASVRF has priority for any distribution pursuant to a waterfall.  *Id.* § 5.2.

[17] *Id.* §§ 3.2, 5.1; *see* PTO ¶ 13.

[18] LLC Agreement § 7.1(a)(ii)(A); *id.* § 7.1(a) (listing "Events of Default"); *see* PTO ¶ 14.

If an Event of Default remained uncured, ASVRF could pursue contractual rights and remedies. One potential remedy was the removal and replacement of Brass Works as the Company's Manager.[19] Another was to seek redemption of ASVRF's membership interests.[20]

## C. The Default

Three years later, the Company failed to pay a preferred return of $81,236.15 that was due to ASVRF on August 1, 2024.[21] The next day, ASVRF sent Brass Works notice that an Event of Default would occur if the payment was not made within the 10-day grace period (by August 12).[22] No payment to ASVRF materialized. On August 16, ASVRF sent Brass Works written notice of an Event of Default.[23]

Brass Works ignored the notice.[24] It continued to miss monthly distribution payments to ASVRF.[25] Meanwhile, Brass Works said that it wished to recapitalize

---

[19] LLC Agreement § 7.2(a)(ii). Although Brass Works, if removed as Manager, would lack voting or consent rights over major decisions, it would remain a passive member of the Company. *See* Cannon Aff. ¶ 24.

[20] *See* LLC Agreement § 7.2(a)(i); *id.* §§ 7.3, 12.3; Greer Tr. 133-36.

[21] PTO ¶ 18; *see* Greer Tr. 124-25.

[22] JX 21; *see also* Cannon Aff. ¶ 39; JX 20.

[23] PTO ¶ 18.

[24] *See* Greer Tr. 128, 131.

[25] PTO ¶¶ 18-19; *see* JX 34; JX 57.

the Cliffs and obtain refinancing to repay ASVRF in full. Brass Works asked ASVRF to forbear on enforcing its contractual remedies in the meantime.[26]

In late 2024, ASVRF outlined to Brass Works its conditions to forbearance, including the payment of past-due preferred returns through the end of 2024.[27] Brass Works again ignored ASVRF.[28] In January 2025, ASVRF made a final appeal to Brass Works, asking it to "work with [ASVRF] in a productive manner."[29] At this point, ASVRF was owed $1,075,772.49 in preferred return payments.[30] Brass Works opted not to respond.[31]

### D. The Replacement Guaranties

To invoke its removal remedy, the LLC Agreement set a process by which ASVRF would step in as "Replacement Guarantor."[32] ASVRF and QuadReal Finance Inc. (the property owner's lender) agreed, in a December 21, 2021 Recognition Agreement, to take certain actions if ASVRF opted to remove and

---

[26] Greer Tr. 141, 144-45. Brass Works did not provide a term sheet or other evidence of refinancing.

[27] JX 56 at 3-4.

[28] *Id.*; *see also* JX 32.

[29] JX 56 at 1-2 ("We have provided you every opportunity to sit down with our firm along with your counsel, and to work with us in a productive manner—but you have refused to engage with us.").

[30] *Id.* at 6.

[31] *See* Greer Tr. 147-50.

[32] LLC Agreement § 7.2(a)(ii).

replace Brass Works as Manager.[33]  Like the LLC Agreement, the Recognition Agreement required ASVRF to execute a non-recourse carveout guaranty and a replacement environmental indemnity agreement (the "Replacement Guaranties") before or concurrent with the removal.[34]

Between January and April 2025, ASVRF and QuadReal negotiated the Replacement Guaranties.[35]  QuadReal told Brass Works that ASVRF had requested loan modification documents to enforce its rights under the LLC Agreement.[36]  Brass Works did not respond to QuadReal on that point, but directed the request to its attorney.[37]

The Replacement Guaranties were finalized in early April.[38]  On April 4, ASVRF delivered its original signature pages to QuadReal.[39]  QuadReal held them

---

[33] JX 11 ("Recognition Agreement") § 5(a); *see* Cannon Tr. 81.

[34] LLC Agreement § 7.2(a)(ii); *see also* Recognition Agreement § 5(a).

[35] Cannon Aff. ¶ 48; *see also* JX 42; JX 44; JX 48; JX 77.

[36] JX 64.  Brass Works objected to the admissibility of JX 64 under Delaware Rule of Evidence 408.  *See* Joint Trial Exhibit List (Dkt. 71).  That objection is overruled.  JX 64 neither contains a settlement offer nor involves a negotiation between the parties.  There were no settlement negotiations underway as of the date of JX 64.  *See* Greer Tr. 155-58, 160, 173.

[37] JX 64.

[38] JX 83; *see also* JXs 84-85.

[39] JX 83.

in escrow until ASVRF authorized it to make the Replacement Guaranties effective on April 7 at 2:21 p.m. Pacific.[40]

### E. The Removal

On April 7, 2025 at 4:59 p.m. Pacific, ASVRF sent Brass Works a notice of removal (the "Removal Notice"), citing the Event of Default eight months earlier.[41] It stated that, "[p]ursuant to Section 7 .2(a)(ii) of the [LLC] Agreement, effective immediately," Brass Works was "removed as Manager of the Company" and ASVRF was "the Company's Manager."[42] The Removal Notice directed Brass Works to facilitate a smooth transition of leadership, such as "deliver[ing] tenant security deposits and other Company monies, deliver[ing] keys and leases, execut[ing] and deliver[ing] notices to third parties" of the change in management, and "transfer[ring] control of Company bank accounts to ASVRF."[43]

ASVRF also emailed the Greers on April 8, requesting basic data to begin transitioning property management from City Homes and Gardens to a company of ASVRF's choice: Greystar.[44] In response, Rob Greer promised to "jump on" the

---

[40] *Id.*; *see* ASVRF's Post-trial Br. 14 n.9 ("The parties' documents were produced with times presented in Coordinated Universal Time (UTC), which is seven (7) hours ahead of Pacific time.").

[41] JX 82; JX 74; *see also* JX 87 (indicating receipt and acknowledgment by the Greers).

[42] JX 74 at 1.

[43] Cannon Aff. ¶ 55; PTO ¶ 21.

[44] JX 92.

management transition task list the week of April 21, after returning from vacation.[45] He represented that he had arranged a refinancing to pay off the QuadReal loan and repay ASVRF by the end of June 2025.[46]

By May, Brass Works' transition obligations remained unfulfilled. It slow-walked "turn[ing] over critical management items" like "physical control of the property, physical lease files, marketing materials, security deposits, Company bank accounts, and control of the Property's website."[47] And it refused to cede operational control to Greystar, denying access to the Cliffs.[48]

### F. The Redemption Notice

On May 8, 2025, Brass Works purported to provide ASVRF notice that the Company was redeeming ASVRF's Class B membership interests (the "Redemption Notice").[49] Brass Works signed the Redemption Notice as the Company's "Manager" and attached a form of redemption agreement also signed by it as "Manager."[50]

---

[45] JX 94; *see* Cannon Aff. ¶ 57; Greer Tr. 160-62.

[46] JX 91.

[47] Cannon Aff. ¶¶ 59, 65.

[48] *Id.* ¶ 65; *see also* Greer Tr. 166-68.

[49] PTO ¶ 40.

[50] JXs 106-07; *see* Greer Tr. 173.

The next day, ASVRF rejected the Redemption Notice, reminding Brass Works that it was no longer the Manager.[51] Though ASVRF was—and is—willing to be redeemed, it felt that the Redemption Notice was a delay tactic.[52] Its suspicions were well placed; Brass Works lacked a commitment letter or term sheet for any refinancing.[53]

On July 2, Brass Works sent a letter following up on the Redemption Notice.[54] It stated—for the first time—that Brass Works disputed its removal as Manager.[55] ASVRF responded that Brass Works lacked the authority to issue a Redemption Notice on behalf of the Company.[56]

## G. The Attempted Condominium Conversion

While Brass Works attempted to redeem ASVRF's membership interests, it was working to convert the Cliffs units from rentals into condominiums. The conversion was not a new idea, but had been floated at the earliest stage of ARA's investment.[57] To implement it, Brass Works would need to obtain regulatory

---

[51] JX 109; *see* Greer Tr. 175-76.

[52] *See* Cannon Tr. 85-90.

[53] *See* Greer Tr. 138-41, 181-83.

[54] JX 135.

[55] *Id.*; *see* PTO ¶ 42.

[56] JX 136; *see* PTO ¶ 43.

[57] *See, e.g.*, JX 28; JX 63; JX 70.

approval, refinance the \senior loan, and redeem ASVRF's membership interests.[58] ASVRF consistently stated that to comply with the LLC Agreement and senior loan agreement, any conversion could occur only after Brass Works redeemed ASVRF's membership interests and paid QuadReal.[59]

Even so, on June 30—after this litigation was filed—Brass Works unilaterally filed a master deed purporting to convert the Cliffs into a condominium building.[60]

## H. This Litigation

On May 16, 2025, ASVRF filed this action for declaratory and injunctive relief against Brass Works and on behalf of the Company as the nominal defendant.[61] Its complaint advances five counts, two of which are resolved in this decision. Count I seeks a declaration under 6 *Del. C.* § 18-110 that Brass Works was removed as

---

[58] *See* Greer Aff. ¶¶ 44-45; Cannon Aff. ¶ 79; Cannon Tr. 102 (testifying that no "commitment" to "deliver [a] unit to [a] purchaser" could occur "until the refinance loan was procured"); *id.* at 24-25, 104.

[59] *See* JX 185 (Cannon Dep.) 64, 67-72, 124-25; Cannon Tr. 23-25, 28-30, 104-05; JX 186 (Stern Dep.) 116-17, 120-21, 143; *see also* LLC Agreement § 6.3(e), (p), (r), (jj).

[60] Cannon Aff. ¶ 84; *see* JXs 166-67; Cannon Tr. 99-100.

[61] Verified Compl. (Dkt. 1) ("Compl.") ¶¶ 59-84. ASVRF also named as defendants Bobby Greer, Rob Greer, Sanford Weiss, and City Homes and Gardens. Only the counts asserted against Brass Works were tried on an expedited basis. *See* PTO ¶ 3 n.2.

11

Manager and replaced by ASVRF.[62]  Count II is a claim for breach of the LLC

Agreement for Brass Works' failure to transition the Manager role.[63]

Brass Works answered the complaint on July 17 and asserted affirmative

defenses and counterclaims against ASVRF, naming the Company as the nominal

defendant.[64]  Counterclaim Count I seeks a declaratory judgment that ASVRF's

attempt to remove Brass Works as Manager is ineffective.[65]  Count II is a claim for

breach of the LLC Agreement due to ASVRF's refusal to acknowledge the

Redemption Notice, and Count III is a related claim for breach of the implied

covenant of good faith and fair dealing.[66]  ASVRF replied to the counterclaims on

July 23.[67]

After expedited discovery, a trial on Count I and II of ASVRF's complaint

and Counts I to III of Brass Works' counterclaims was held on August 27.[68]  The

---

[62] ASVRF also declared that "as Manager of the Company, [the p]laintiff has the sole right and authority to make all decisions relating to the Company."  Compl. ¶ 62.

[63] *Id.* ¶¶ 65-68.

[64] Brass Works Urban Renewal Company LLC's Answer to Verified Compl. (Dkt. 29) ("Answer"); Verified Countercl. (Dkt. 31) ("Countercl.").  Brass Works delayed in appearing, prompting ASVRF to move for a partial default judgment. Dkt. 18.  At a July 1 default judgment hearing, Rob Greer appeared and asked for additional time to retain counsel.  I set a deadline for Brass Works to answer the complaint and directed the parties to confer on a schedule for an expedited trial on Counts I and II.  *See* Dkts. 27-28.

[65] Countercl. ¶¶ 88-96.

[66] *Id.* ¶¶ 97-112 (breach of contract); *id.* ¶¶ 113-22 (implied covenant).

[67] Pl.-Countercl.-Def.'s Answer to Verified Countercl. (Dkt. 37).

[68] *See* Dkt. 82.

12

matter was taken under advisement as of September 12, when each party filed a post-trial brief.[69]

## II. LEGAL ANALYSIS

This case is, at bottom, one brought under 6 *Del. C.* § 18-110 to determine the proper Manager of the Company. Section 18-110(a) grants this court authority to "hear and determine the validity of any . . . removal or resignation of a manager of a limited liability company . . . and the right of any person to become or continue to be a manager of a limited liability company[.]"[70] The court "may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the [entity]."[71]

The claims presented at trial stem from the core dispute over which party— ASVRF or Brass Works—is the rightful Manager. "The parties have the burden of proving their respective claims by a preponderance of the evidence."[72] "Proof by a

---

[69] *See* ASVRF's Post-trial Br. (Dkt. 89); Brass Works' Post-trial Br. (Dkt. 88). The parties did not request post-trial argument, and I deemed it unnecessary.

[70] 6 *Del. C.* § 18-110(a).

[71] *Id.*

[72] *Lynch v. Gonzalez*, 2020 WL 4381604, at *30 (Del. Ch. July 31, 2020), *aff'd*, 253 A.3d 556 (Del. 2021); *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967).

preponderance of the evidence means proof that something is more likely than not."[73] Only ASVRF has met its burden.

ASVRF proved that it validly removed Brass Works as Manager, and that ASVRF now holds that position. Judgment on Count I of the complaint and the corresponding counterclaim (Count I) is in ASVRF's favor. ASVRF also proved that Brass Works breached the LLC Agreement by flouting its obligations to transition the Manager role. Judgment on Count II of the complaint is in ASVRF's favor. Brass Works did not prove its remaining counterclaims (Counts II and III), on which judgment is in ASVRF's favor. Brass Works also waived or failed to prove its affirmative defenses. My reasoning follows.

## A. The Removal Notice's Validity

In Count I of their respective pleadings, ASVRF and Brass Works each seek a declaration on the effectiveness of ASVRF's Removal Notice. ASVRF asserts that it validly removed Brass Works under the LLC Agreement and that ASVRF is now

---

[73] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010).

the Manager.  Brass Works claims the opposite.[74]  An actual controversy over the current Manager of the Company exists and is ripe for adjudication.[75]

Resolving the dispute hinges on the terms of the LLC Agreement.  "[W]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts."[76]  "Delaware law adheres to the objective theory of contracts," which means that "a contract's construction should be that which would be understood by an objective, reasonable third party."[77]  In seeking to interpret the contract, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement[.]"[78]  The court will analyze the

---

[74] Brass Works also argues that Section 7.2(a)(ii) of the LLC Agreement, which prohibits the Manager from disputing the effectiveness of its removal, is void as a matter of public policy under *Terrell v. Kiromic Biopharma, Inc.*  *See* 297 A.3d 610, 620-21 (Del. 2023) (rejecting a claim that a party could "ex ante contractually forgo [its] right to any and all forms of judicial review" as "contrary to Delaware law"); *see infra* note 89.  Because I conclude that Brass Works' removal was valid on the merits, I need not address whether the contractual bar on disputing that removal is enforceable.

[75] *See* 10 *Del. C.* § 6501; *XL Specialty Ins. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014).

[76] *Holifield v. XRI Inv. Hldgs., LLC*, 304 A.3d 896, 923-24 (Del. 2023) (quoting *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *2 (Del. Ch. June 27, 2019)); *see also* 6 *Del. C.* § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").

[77] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[78] *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

15

contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[79]

If a contract is unambiguous, the court will not look beyond its four corners. A contract is ambiguous where the provisions at issue are "fairly susceptible" to different interpretations.[80] But "[t]he parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous. The determination of ambiguity lies within the sole province of the court."[81]

### 1. Event of Default

Under the LLC Agreement, once a set amount of accrued preferred returns is reached (the "Capitalized Preferred Return Accrual Cap"), the Company must pay monthly distributions to ASVRF:

> [T]he Company shall pay to [ASVRF] the amount of any accrued and unpaid Capitalized Preferred Return that exceeds the Capitalized Preferred Return Accrual Cap pursuant to, and in accordance with, Section 6.2(f) . . . , it being the intent of the Members that in no event shall the accrued and unpaid

---

[79] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)).

[80] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (holding that contractual provisions control "when they establish the parties' common meaning[,]" such that "a reasonable person in the position of either party would have no expectations inconsistent with the contract language"); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (stating that language that is "[c]lear and unambiguous" must "be given its ordinary and usual meaning").

[81] *Osborn*, 991 A.2d at 1160 (citation omitted); *see also In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (noting that the court will only consider extrinsic evidence when "ambiguity flow[s] from [the] contractual language").

Capitalized Preferred Return exceed the Capitalized Preferred Return Accrual Cap.[82]

If there were a shortfall, Brass Works (the "Class A Member") was "obligated to make such Additional Capital Contributions to the Company as may be required under Section 3.2 in order to pay such Capitalized Preferred Return."[83]

If Brass Works failed to pay the amount owed to ASVRF (the "Class B Member") within ten days of the due date, an Event of Default occurred. Section 7.1(a)(ii) unambiguously states:

> (A) the failure of the Company, or the Class A Member, or any Indemnitor or any party owing a monetary obligation to the Class B Member under the Transaction Documents *to pay any amount owing to the Class B Member* (including any amounts necessary to effectuate the Redemption or other amounts due to the Class B Member under the Transaction Documents), *within ten (10) days after the due date or within ten (10) days following written demand for payment*, if there is no due date; or (B) the failure of Class A Member to make any Additional Capital Contribution as and when required to be contributed to the Company pursuant to Section 3.2(d)[.][84]

---

[82] LLC Agreement § 5.1; *see also id.* §§ 3.2, 5.2.

[83] *Id.* § 5.1.

[84] *Id.* § 7.1(a)(ii)(A) (emphasis added). Brass Works asks me to consider "parol evidence," notwithstanding its contention that the terms of the LLC Agreement are "plain and unambiguous." Brass Works' Post-trial Br. 2, 11, 15. It repeatedly references a term sheet (JX 2). Because I agree that the LLC Agreement is fully integrated and unambiguous, I reject Brass Works' invitation to look beyond the contract's four corners. *See* LLC Agreement § 16.10; *see also supra* note 81 and accompanying text.

Brass Works concedes that an Event of Default occurred.[85]  ASVRF was owed $81,236.15 on August 1, 2024.[86]  That amount was not paid—within 10 days, after ASVRF submitted a written demand for payment on August 16, or since.[87]

### 2.  Remedies Following an Event of Default

If an Event of Default were uncured, Section 7.2 of the LLC Agreement gave ASVRF the right, "in its sole and absolute discretion," to exercise "one or more" remedies.[88]  These remedies included, among others, demanding immediate redemption (Section 7.1(a)(i)) or removing the Manager (Section 7.1(a)(ii)). ASVRF chose removal.

Section 7.1(a)(ii) permitted ASVRF to remove the Manager and appoint itself Manager, effective upon the delivery of a Removal Notice:

> If the applicable Event of Default remains uncured, Class B Member may remove the then Manager as the Manager by delivering to such Manager written notice ("Removal Notice") exercising such removal and then appoint a Class B Member Appointed Manager as the Manager of the Company.  The removal of Manager shall be effective immediately upon delivery of the Removal Notice, and the parties acknowledge that neither Class A Member nor Manager (if Manager is not then the

---

[85] *See* Greer Tr. 133.

[86] PTO ¶ 18.

[87] JX 21 at 6-8; PTO ¶¶ 18-19.

[88] LLC Agreement § 7.2(a).

> Class A Member) shall have the right to dispute the effectiveness of its removal pursuant to any Removal Notice.[89]

ASVRF sent Brass Works a Removal Notice on April 7, 2025.[90] It stated that, "[p]ursuant to Section 7.2(a)(ii)," Brass Works was "[t]hereby removed as Manager of the Company."[91] It also stated that ASVRF was "the Company's Manager" with "full and complete authority and discretion in the management and control of the business and affairs of the Company as set forth in the [LLC] Agreement."[92]

### 3. Conditions to Removal

Brass Works insists that the Removal Notice is ineffective because "ASVRF did not satisfy all conditions precedent to ASVRF exercising its rights under Section 7.2(a)(ii)."[93] Its counterclaims state that "[w]ithout first executing and delivering a Replacement Guarantee, ASVRF could not exercise its right to remove [Brass Works] as Manager of the Company under Section 7.2(a)(ii)."[94] That assertion proved baseless.

---

[89] LLC Agreement § 7.2(a)(ii).

[90] JX 82; Greer Tr. 136.

[91] JX 82 at 2; *see* PTO ¶ 20.

[92] JX 82 at 2.

[93] Countercl. ¶ 89; *see* Brass Works' Post-trial Br. 19-20.

[94] Countercl. ¶ 90.

Section § 7.2(a)(ii) of the LLC Agreement prescribes how ASVRF may step in as Replacement Guarantor in conjunction with removing Brass Works as Manager:

> Notwithstanding the foregoing or anything to the contrary set forth herein, *in the event that the then-applicable Third Party Loan Documents require, as a condition precedent* to the exercise by Class B Member of its right under this Section 7.2(a)(ii) to remove the Manager as the Manager and appoint a Class B Member Appointed Manager as the Manager of the Company, that Class B Member or its creditworthy Affiliate execute and deliver to the applicable lender a replacement non-recourse carve-out guaranty and replacement environmental indemnity agreement, then Replacement Guarantor shall execute such replacement non-recourse carve-out guaranty and replacement environmental indemnity, whereupon the same shall constitute Replacement Guaranties hereunder . . . .[95]

The Recognition Agreement between ASVRF and QuadReal required ASVRF to cause a creditworthy party to execute Replacement Guarantees in favor of QuadReal:

> *Prior to or concurrently with the completion of a Control Shift Event*, a Qualified Replacement Guarantor (as defined in the Loan Agreement) shall execute and deliver to Lender (1) a supplemental carve-out guaranty in substantially the form of the Loan Carveout Guaranty, and (2) a supplemental environmental indemnification agreement in substantially the form of the Loan Environmental Indemnity, each of which shall provide for the obligations of such obligor in accordance with the requirements of Section 5(b) below.[96]

---

[95] LLC Agreement § 7.2(a)(ii) (emphasis added).

[96] Recognition Agreement § 5(a) (emphasis added); *see also* Cannon Tr. 81.

These requirements were met. In its post-trial brief, Brass Works acknowledged that ASVRF "negotiated Replacement Guarantees and loan amendments with [QuadReal]."[97] ASVRF executed the Replacement Guarantees, which became effective before the Removal Notice was delivered to Brass Works on April 7.[98]

Even if the timing were imperfect, Brass Works lacks standing to enforce this condition. The requirement to provide Replacement Guarantees protected QuadReal by ensuring its loan was continuously secured by a credit worthy guarantor. QuadReal accepted ASVRF's performance and raised no objection to the timing or effectiveness of the Replacement Guarantees. Brass Works cannot assert a contractual defense based on a condition that was successfully fulfilled and accepted by the party it benefitted.

Given these facts, Brass Works has pivoted to arguing that ASVRF had an "implied obligation to provide Brass Works with those Replacement Guarantees prior to sending its Notice of Removal, which it failed to do in breach of its obligations."[99] But the implied covenant of good faith and fair dealing, which

---

[97] Brass Works' Post-trial Br. 19.

[98] *See* JX 83 at 1; JX 82; *supra* notes 40-41 and accompanying text; *see also* Cannon Aff. ¶ 52.

[99] Brass Works' Post-trial Br. 19 (arguing that "without Brass Works' knowledge, ASVRF negotiated Replacement Guarantees and loan amendments with the senior lender while

21

"involves a cautious enterprise, inferring contractual terms [that] . . . neither party anticipated,"[100] is an ill fit. "The implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand."[101]

The LLC Agreement addresses the process for effective removal of a Manager and the timing for Replacement Guarantees.[102] It explains that the lender, QuadReal, *may* require replacement guarantees before consenting to removal.[103] But that contract, negotiated by sophisticated parties represented by counsel,[104] lacks any timing condition on the delivery of Replacement Guarantees to Brass Works. The

---

Brass Works was still the Manager and never provided those documents to Brass Works" (emphasis omitted)).

[100] *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010) (citation omitted).

[101] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015), then quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)); *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.").

[102] *See* LLC Agreement § 7.2(a)(ii).

[103] *Id.*

[104] *See* Greer Tr. 117.

loan documents similarly lack any such requirement.[105]   The implied covenant cannot be wielded to create a new contract term that the parties did not bargain for.[106]

\*          \*          \*

An Event of Default occurred under Section 7.1(a)(ii)(A).  ASVRF elected to exercise its removal right under Section 7.2(a)(ii) and complied with Section 7.2.  Thus, upon delivery of the Removal Notice, Brass Works was no longer the Company's Manager and ASVRF became the Manager.  ASVRF is entitled to a declaration that the Removal Notice is valid and effective.  Judgment on Count I of the complaint and Count I of the counterclaim is in ASVRF's favor.

## B.    Brass Works' Cooperation Requirement

In Count II of its complaint, ASVRF claims that Brass Works breached the LLC Agreement by refusing to transition the Manager role to ASVRF.[107]   To establish a breach of contract under Delaware law, a plaintiff must show that a contract exists between the parties, the defendant breached the terms of the contract,

---

[105] JX 9 (Loan Agreement).

[106] *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 188 n.438 (Del. Ch. 2020) (citing *Fortis Advisors LLC v. Shire US Hldgs., Inc.*, 2017 WL 3420751, at \*8 (Del. Ch. Aug. 9, 2017) ("[C]ourts generally will not 'blue-pencil' contracts by inserting language into agreements that does not exist.")); *Nemec*, 991 A.2d at 1126 (explaining that the implied covenant cannot be used to "rewrite a contract" for parties who now "believe [it] to have been a bad deal").

[107] ASVRF's Post-trial Br. 35-38.

and the plaintiff suffered damages as a result.[108] ASVRF has proven each of these elements.

Section 7.2(a)(ii) of the LLC Agreement requires that after being removed as Manager, Brass Works "reasonably cooperate with the Company to allow the Company to effectively and productively continue the leasing, operation, marketing and other activities of the Company."[109] The LLC Agreement itemizes specific actions that Brass Works must immediately take after removal:

> (aa) deliver to Class B Member a final accounting, (bb) surrender and deliver to the Class B Member Appointed Manager Person all rents and income, including tenant security deposits, of the Project and other monies of the Company held by, or under the control of the removed Manager, (cc) deliver to the Class B Member Appointed Manager Person, as received, any monies due the Company received after such removal, (dd) deliver to the Class B Member Appointed Manager Person all materials and supplies, keys, leases, contracts and documents, all other accounting papers and records of the Company, and all books and records, receipts for deposits, bills and other materials in the removed Manager's possession that relate to the Project, (ee) execute and deliver to the Class B Member Appointed Manager Person a notice to third parties directly involved with the Project in a form reasonably satisfactory to the Class B Member to the effect that the removed Manager is no longer the Manager of the Company, (ff) deliver to the Company such information and documentation in the removed Manager's control or possession at the time of removal as the Class B Member Appointed Manager may reasonably request concerning the Project, including any potential tenants for the Project known by the removed Manager at the time of removal, [and] (gg) execute such

---

[108] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[109] LLC Agreement § 7.2(a)(ii).

instruments and take such actions as Class B Member may reasonably request to effect the removal described herein. After removal, Class A Member shall reasonably cooperate with the Company to allow the Company to effectively and productively continue the leasing, operation, marketing and other activities of the Company.[110]

Brass Works breached these obligations. Brass Works began to transition management to ASVRF by providing financial performance reports about the Cliffs.[111] But it stopped, first "slow walk[ing]" the transition and then refusing even to acknowledge that it was removed.[112] It also blocked ASVRF's newly hired property manager, Greystar, from accessing the Cliffs.[113] It continued to sign notices and contracts on the Company's behalf, and filed a master deed purporting to convert the property to a condominium community.[114]

These actions have damaged ASVRF by depriving it of its bargained-for right to act as Manager after exercising its removal remedy.[115] Since Brass Works has

---

[110] LLC Agreement § 7.2(a)(ii).

[111] JXs 92-96; JX 99; JX 104.

[112] JX 72 at 16; *see also* JX 96 at 1 ("[We are] just [sending transition information] to put off the eventual fight and lawsuit potential."); JX 103 at 1 (email from Rob Greer instructing his team to "not respond" to ASVRF communications regarding transition materials).

[113] *See* JX 98 at 8; *see also supra* note 48 and accompanying text.

[114] *See* JXs 106-07; JX 133; Greer Tr. 168-170, 172-174; *see also supra* notes 50, 60 and accompanying text.

[115] *VLIW Tech.*, 840 A.2d at 612 (stating that "the breach of an obligation imposed by [a valid] contract" furnishes the basis for a breach of contract claim and gives rise to "resultant damage").

refused to turn over critical items—including marketing materials, access to the property's websites, access to the Company's bank accounts, and physical lease files—ASVRF cannot fulfill its role as Manager. Brass Works continues to market the Cliffs units as condominiums for individual purchase.[116]

As a remedy, ASVRF seeks a permanent injunction barring Brass Works "from misrepresenting to third parties that it is the Manager of the Company, and from taking any actions that are inconsistent with [ASVRF's] role as sole Manager of the Company."[117] It also seeks an injunction compelling Brass Works to comply with its obligations in Section 7.2(a)(ii) to deliver information, transfer accounts to, and cooperate with ASVRF as Manager.[118]

ASVRF is entitled to declaratory relief to this effect. I do not, however, believe that the extraordinary remedy of a permanent injunction is warranted.[119] I have found that ASVRF is the lawful Manager of the Company. I have also found that Brass Works breached its obligation to turn over managerial authority to

---

[116] JX 131; JX 72 at 16; JX 73 at 11; JX 98 at 7; Greer Tr. 156.

[117] Compl. ¶ 67.

[118] *Id.* ¶ 68; *see supra* note 110 and accompanying text (outlining these requirements).

[119] *See, e.g.*, *Tulou v. Hertrich*, 1998 WL 409160, at *1 (Del. Ch. June 22, 1998) ("Injunctive relief, especially the extraordinary remedy of mandatory injunctive relief lies only in equity and will only issue where the facts, the law and the conscience of the [c]ourt believe it to be appropriate.").

ASVRF. I have no reason to believe that an injunction is needed to cause Brass Works to comply.[120]

## C. The Redemption Notice's Ineffectiveness

Brass Works' primary rebuttal to its removal is to insist that it redeemed ASVRF's shares.[121] It brings two related counterclaims against ASVRF to that effect: one for breach of the LLC Agreement (Count II), and another for breach of the implied covenant of good faith and fair dealing (Count III).[122] Both theories are meritless.

### 1. No Express Breach

Section 12.1 of the LLC Agreement addresses the mandatory redemption of ASVRF's Class B membership interests. It outlines the requirement and mechanism for buying out ASVRF's investment:

> On or prior to the earlier of (i) the date which is one hundred twenty six (126) months after the Effective Date or (ii) the maturity date (as the same may be extended) of the Senior Loan or, if the Senior Loan has been refinanced with the Future Senior Loan, then the maturity date of the Future Senior Loan (the

---

[120] *See Buescher v. Landsea Homes Corp.*, 2023 WL 5994144, at *1 (Del. Ch. Sept. 15, 2023) (stating that "the availability of a declaratory judgment at law makes the need for injunctive relief unlikely"); *ISS Facility Servs., Inc. v. JanCo. FS 2, LLC*, 2023 WL 4096014, at *2 (Del. Ch. June 20, 2023) (holding that a declaratory judgment "would suffice to accomplish" the injunctive relief sought).

[121] Brass Works' Post-trial Br. 11.

[122] Countercl. ¶¶ 97-112.

27

"Mandatory Redemption Date"), *the Company* shall cause the Redemption Closing to occur pursuant to Section 12.5 below.[123]

Section 12.5 sets out the steps that must be taken by the Company at the redemption closing.[124]

Brass Works argues that Section 12.1 grants it unfettered discretion to redeem the membership interests of ASVRF on or before (1) 126 months after the LLC Agreement takes effect, or (2) the maturity date of the senior loan.[125] Not so. The LLC Agreement grants the Company—not Brass Works—a mandatory redemption right. Brass Works is not "the Company," which the LLC Agreement defines as Paterson Plank RD, J-C, LLC.[126]

When Brass Works served the Redemption Notice on May 8, 2025, it had been removed as Manager for a month.[127] It therefore could not act on the Company's behalf in submitting the Redemption Notice under Section 12.1.[128]

Brass Works further contends that Sections 7.2(a)(i) and 7.3 of the LLC Agreement grant it redemption rights as the Class A Member, even if it were

---

[123] LLC Agreement § 12.1 (emphasis added).

[124] *Id.* § 12.5.

[125] Brass Works' Post-trial Br. 7; *see also* Countercl. ¶ 103.

[126] LLC Agreement, Preamble, art. 1.

[127] PTO ¶ 40.

[128] *See supra* notes 82-106 and accompanying text.

removed as Manager.[129]  This argument misstates the contract.  Article 7 of the LLC Agreement, titled "Default by Manager and Class A Member," addresses ASVRF's rights and remedies upon an Event of Default.[130]  Like Section 7.2(a)(ii), Section 7.2(a)(i) provides a remedy that ASVRF (the Class B Member) may pursue upon an Event of Default:

> Upon the occurrence of an Event of Default described in Section 7.1 which remains uncured, the Class B Member may, in its sole and absolute discretion, exercise any one or more of the following remedies following or concurrently with its written declaration of an Event of Default by written notice to the Manager . . . (i) Class B member may require the immediate Redemption by the Company of the Class B Member's Membership Interest in accordance with Section 12.3 within the Default Redemption Period (as defined in Section 12.3) and any failure to cause the Redemption Closing to occur timely following such election shall be a continuous and uncurable Event of Default, except that the Company (and the Class A Member and the Manager on behalf of the Company) will have a continuing right to cause the Redemption Closing to occur as set forth in Section 7.3 . . . .[131]

ASVRF did not demand redemption under Section 7.2(a)(i).  It opted to pursue removal of the Manager under Section 7.2(a)(ii).  The terms of Section 7.2(a)(i) therefore have no bearing on the current dispute.[132]

---

[129] Brass Works' Post-trial Br. 12.

[130] LLC Agreement, art. 7.

[131] *Id.* § 7.2(a)(i).

[132] *See supra* notes 82-106 and accompanying text.

### 2. No Implied Breach

Brass Works contends that "to the extent not expressly agreed to, ASVRF and Brass Works impliedly covenanted that Brass Works as the Class A Member"—in addition to the Company—"could trigger the Mandatory Redemption."[133] But the LLC Agreement is not silent such that there is a gap to be filled. It speaks directly to the parties' rights and obligations on mandatory redemption and the redemption closing.[134] It grants the Company—not the Class A Member—the right to invoke mandatory redemption of the Class B Member. The implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue."[135] Counterclaim Count III, which is duplicative of Count II, is thus dismissed.[136]

### D. Brass Works' Affirmative Defenses

Brass Works raised numerous affirmative defenses in its answer, including "waiver, acquiescence, accord and satisfaction, unclean hands, and/or estoppel," and

---

[133] Countercl. ¶ 117; *see* Brass Works' Post-trial Br. 17.

[134] *See* LLC Agreement §§ 12.1, 12.5; *see also Gerber v. Enter Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) ("Express contractual provisions always supersede the implied covenant."), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013).

[135] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008); *see In re Dura Medic Hldgs., Inc. Consol. Litig.*, 333 A.3d 227, 264 (Del. 2025); *Nemec*, 991 A.2d at 1127 ("The implied covenant will not infer language that contradicts a clear exercise of an express contractual right."); *see also supra* notes 99-106 and accompanying text (describing the implied covenant).

[136] *See Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *18 (Del. Ch. Nov. 19, 2013) (stating that use of "the implied covenant, to the extent that [an] implied covenant merely duplicates breach of contract claims . . . is fatally flawed").

"bad faith."[137] Many of these defenses are irrelevant to this control dispute.[138] And the defenses that purport to negate Brass Works' removal as Manager are either waived or meritless.[139]

Brass Works spent little effort briefing its equitable affirmative defenses.[140] It did not mention waiver, acquiescence, or accord and satisfaction in its pre- or post-trial brief. And it did not expressly raise unclean hands, bad faith, or estoppel in its post-trial brief.[141] Still, it argues that equity should bar ASVRF from "[o]btaining an [u]nbargained [f]or [w]indfall," which could arguably bear on estoppel and bad faith.[142]

Even if they were fairly presented, these defenses provide no aid to Brass Works. In *Nemec v. Shrader*, the Delaware Supreme Court emphasized that "[a]

---

[137] Answer 45-46. It also raised affirmative defenses that are arguments on the merits, such as failure to state a claim. *Id.* Contractual defenses on the right to redeem and the failure of a condition precedent on Replacement Guarantees are addressed above. *See supra* Sections II.A, C.

[138] For example, Brass Works asserts that ASVRF "failed to mitigate any alleged damages." Answer 46. No damages are being awarded, however. Nor has ASVRF breached the LLC Agreement to give rise to hypothetical damages.

[139] *See* JX 170 (Brass Works' Resp. to ASVRF's First Set of Interrogs.) Nos. 11, 13.

[140] *See* Brass Works' Pre-trial Br. (Dkt. 77) 37 ("ASVRF's misconduct detailed above should satisfy Brass Works' burden to sustain its equitable affirmative defenses, including unclean hands, estoppel, and bad faith." (citing Answer 45-46)).

[141] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[142] Brass Works Post-trial Br. 21; *id.* at 23-29.

party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[143]  By removing Brass Works as Manager, ASVRF acted pursuant to its express rights under the LLC Agreement.  Nothing in the record supports the notion that ASVRF did so in bad faith.  Rather, ASVRF only enforced its removal right after forbearing for eight months after the Event of Default.  Its restraint, and repeated attempts to work with Brass Works, suggest a good faith intent to protect its investment.[144]

To the extent that Brass Works insists ASVRF is estopped from removing it as Manager, that position also lacks support.[145]  Brass Works suggests that ASVRF knew about the condominium conversion plan and Brass Works' intention to obtain refinancing and redeem ASVRF's interest in full through the conversion.[146]  It notes that condominium purchase contracts were executed months ago "with ASVRF's

---

[143] *Nemec*, 991 A.2d at 1128.

[144] *See supra* notes 27, 29-30 and accompanying text.

[145] Under the doctrine of equitable estoppel, "a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment."  *Wilson v. Am. Ins.*, 209 A.2d 902, 903-04 (Del. 1965).  A party claiming estoppel must show that they: (1) "lacked knowledge or the means of obtaining knowledge of the truth of the facts in question[,]" (2) "reasonably relied on the conduct of the party against whom estoppel is claimed[,]" and (3) "suffered a prejudicial change of position as a result of their reliance."  *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005).

[146] Brass Works' Post-trial Br. 6.

support" while Brass Works was Manager, making it inequitable for ASVRF to gain the ability to terminate those agreements.[147] This defense fails.

First, ASVRF's knowledge of the conversion plan does not equate to contractual approval or implied waiver. The LLC Agreement required ASVRF's written consent for a condominium conversion, deeming it a "Major Decision" and a breach of the agreement to proceed without that consent.[148] Brass Works cannot establish justifiable reliance on ASVRF's silence or knowledge when the underlying action was barred by the governing contract absent formal written consent.

Second, any assent ASVRF gave to the conversion was consistently conditioned on Brass Works first securing refinancing sufficient to redeem ASVRF's preferred equity and pay off QuadReal.[149] This step is fundamental to the deal structure. Brass Works admits that it lacked the ability to do so, failing to produce a term sheet or commitment letter for the necessary financing at the time of its alleged reliance.[150] Any reliance was therefore placed on an incomplete, unauthorized, and unfinanceable plan.

---

[147] *Id.* at 29.

[148] LLC Agreement § 6.3.

[149] *See* Cannon Aff. ¶ 82.

[150] *See* Greer Tr. 138; Cannon Aff. ¶ 84.

## III. CONCLUSION

Judgment on Count I of the complaint and Counts I through III of the counterclaims is for ASVRF. ASVRF is entitled to a declaration that, under the Removal Notice, it validly removed Brass Works as Manager and became the Company's sole Manager. ASVRF is also entitled to a declaration that Brass Works must comply with its obligations in the LLC Agreement to transfer management of the Company to ASVRF. Because it is not the prevailing party, Brass Works' request for fees is denied.

The parties must confer on a proposed order to implement this decision and file it within five business days.